# EXHIBIT  A



**CREW** | citizens for responsibility and ethics in washington

November 23, 2010

**By Fax (202-514-5331) and First-Class Mail**

Matthew Miller
Director
Office of Public Affairs
U.S. Department of Justice
Room 1128
950 Pennsylvania Avenue, N.W.
Washington, D.C.  20530-0001

Re: FOIA Request for Expedition

Dear Mr. Miller:

Pursuant to U.S. Department of Justice (DOJ) Freedom of Information Act (FOIA) regulations, specifically 28 C.F.R. § 16.5(d)(2), Citizens for Responsibility and Ethics in Washington (CREW) requests that you grant its request for expedition of the enclosed FOIA request of this date.

CREW's request seeks copies of all emails to or from former Assistant Attorney General John Yoo over which the Justice Management Division (JMD) has custody.  CREW also seeks all documents concerning DOJ's efforts to recover emails from Mr. Yoo.

CREW requests expedition in light of the widespread and exceptional media interest in this matter and the questions that have been raised about the circumstances under which the emails of Mr. Yoo were destroyed, the extent to which DOJ has attempted to restore the missing emails, and DOJ's continuing failure to answer inquiries about this matter from Congress and the National Archives and Records Administration.  Just recently Assistant Attorney General Ronald Weich advised the House and Senate Judiciary Committees that DOJ had review recovered emails not available to OPR when it conducted its investigation into the actions of Mr. Yoo and others in drafting the now discredited OLC torture memos, and saw no reason to change Associate Deputy Attorney General David Margolis' conclusions as reflected in his Decision Memorandum.  But DOJ has refused to make those recovered emails available for public review and has yet to answer longstanding questions from Congress about the missing emails.  Please note that CREW's prior request for expedition of its  February 26, 2010 FOIA request related to this matter was granted.  Similarly, expedition is warranted here.

Moreover, as CREW explained it is FOIA request, CREW is a non-profit organization

Matthew Miller
November 23, 2010
Page Two

engaged primarily in disseminating information it gathers from a variety of sources, including the FOIA, and seeks information requested in this FOIA request for the express purpose of disseminating it to the public. CREW's website, www.citizensforethics.org, contains links to thousands of pages of documents CREW acquired from multiple FOIA requests, as well as documents related to CREW's FOIA litigation, other complaints, and CREW reports based in part on documents acquired through the FOIA. Similarly, CREW posts documents received through the FOIA on www.scribd.org, and its documents have received 468,197 visits since April 14, 2010.

For the foregoing reasons as well as those set forth in CREW's FOIA request of November 18, 2010, CREW requests that you grant its request for expedition.

Pursuant to 28 C.F.R. § 16.5(d)(3), I hereby certify that the basis for CREW's request for expedition is true and correct to the best of my knowledge and belief.

Sincerely,

Anne L. Weismann
Chief Counsel

Enclosure

# EXHIBIT B

 **CREW** | citizens for responsibility and ethics in washington

BUILDING A BETTER WASHINGTON



GET UPDATES

Email Address

Zip Code     **SUBSCRIBE**

**MISSION     SCANDALS & SCOUNDRELS     PRESS     BLOG     VIDEO     POLICY     LEGAL FILINGS**

Home > Press

 **PRESS**           SHARE    PRINT    COMMENT 

October 26, 2010

# "Found" John Yoo Emails Shed No Light on What Mr. Yoo Did For The Department of Justice

Categories: Federal Agencies, Department of Justice, Press Releases, John Yoo

On August 30, 2010, as part of a lawsuit CREW brought against the Department of Justice (DOJ) for the missing John Yoo emails, DOJ produced 927 pages of emails located in Mr. Yoo's mailbox. While this production suggests DOJ finally may have located what it told the Office of Professional Responsibility several years ago was missing, it sheds no light on Mr. Yoo's role in drafting the torture memos or, indeed, on anything Mr. Yoo may have done while at DOJ. Instead, the vast majority of these 927 pages consists of email traffic regarding Mr. Yoo's frequent stints as a lecturer and the various and sundry articles he published while employed by DOJ. It seems that Mr. Yoo, while on the federal payroll, was busy expanding his credentials for the next job on which he had set his sights – a return to academia.

According to a cover letter accompanying the production, DOJ is withholding 147 documents in full and has 32 other documents in circulation with other entities for referral or consultation. With nothing to guide us on the subject matter or content of these additional documents, we still have no idea what real work Mr. Yoo did for the department or whether he preserved any of his emails dealing with agency business. But at least we know he was really busy speaking to Federalist Societies from coast to coast.

Click here  to read the October 22 letter to CREW from Letter from Jacqueline Coleman Snead at the U.S. Department of Justice.

Click here to read the index of withheld documents.

Click here to read the letter to CREW's Chief Counsel Anne Weismann from the U.S. Department of Justice.

Click here to read the emails from John Yoo.

Click here to read the documents CREW received in response to this request.

 **DONATE NOW**

**SEND US A TIP**

**TELL A FRIEND** Share Tweet

 Blog


NOVEMBER 03, 2011
Agency Nullification at the FEC
The agency charged with implementing and enforcing campaign finance law often does neither.

OCTOBER 27, 2011
Common Ground
Congress isn't done serving corporate interests. When will it press as hard to protect the rest of us?

**More Blog Posts >**

 Scandals & Scoundrels

 **DOMESTIC ABUSE** A PROBLEM IN THE DEFENSE DEPT.

 **CREW'S MOST CORRUPT**

# EXHIBIT C

# CREW | citizens for responsibility and ethics in washington

### The Missing John Yoo Emails – What Did CREW Learn?

As CREW's Freedom of Information Act (FOIA) lawsuit against the U.S. Department of Justice (DOJ) over the missing John Yoo emails draws to a close, it is time to assess what CREW learned. The relatively limited volume of emails DOJ eventually produced is as enlightening for what it includes as what it omits. DOJ's processing of CREW's FOIA requests also speaks volumes, as does the way in which it handled requests for information from both the National Archives and Records Administration (NARA) and Congress. And while some of the mystery surrounding the missing Yoo emails has been resolved, key questions remain.

By way of background, on February 19, 2010, DOJ's Office of Professional Responsibility (OPR) released publicly a July 2009 report of its investigation into the Office of Legal Counsel's (OLC) preparation of memoranda evaluating the use of torture in the context of interrogations conducted outside the United States (torture memos), including the roles of former OLC Deputy Assistant Attorneys General John Yoo and Patrick Philbin. The report noted OPR was "hampered by the loss of Yoo's and Philbin's email records," and described most of Mr. Yoo's emails as having been "deleted and . . . reportedly not recoverable."

On February 24, 2010, in response to this revelation, NARA requested that DOJ determine within 30 days whether the deletion of the Yoo and Philbin emails constituted an unauthorized destruction of records in violation of federal law. Congressional requests for additional information also followed from John Conyers (D-MI), then chairman of the House Committee on the Judiciary, and Senate Judiciary Committee Chairman Patrick Leahy (D-VT).

CREW responded by filing two FOIA requests with OLC in February and March 2010. The February request sought record keeping guidance in effect during Mr. Yoo's DOJ tenure as well as records reflecting any problems with the storage or retention of OLC staff emails during that time. With its March request CREW sought copies of all emails Mr. Yoo sent or received in an effort to verify whether his emails in fact were missing.

DOJ ignored the FOIA requests until CREW sued the department. Then, in response to the first request, OLC turned over record keeping guidance making clear Mr. Yoo had a legal obligation to preserve emails qualifying as records during his DOJ tenure. The agency had no records documenting any component-wide emails problems, meaning that whatever happened to Mr. Yoo's emails likely was unique to him. As for the second request, DOJ eventually produced 229 documents consisting of emails located in Mr. Yoo's mailbox, although DOJ redacted information from some based on claimed exemptions and withheld 151 others in full. [ letter #1, letter #2, documents received ] In all, OLC located only 380 emails, purportedly representing the sum total of all emails in Mr. Yoo's email account he either received or sent during his nearly two-year tenure at DOJ.

For many, 380 emails would represent a daily or perhaps weekly haul of emails, given how ubiquitous emailing has become. Yet DOJ claimed a nearly two-year total of emails for Mr. Yoo – a high-level OLC official in the thick of many important issues at DOJ – that averages out to Mr. Yoo sending or receiving approximately one email every other day.[1] Incredible enough as this is, the vast majority of the email traffic had little, if anything, to do with Mr. Yoo's assigned responsibilities at DOJ. Instead, it concerned his frequent stints as an outside lecturer and the various and sundry articles he published while employed at DOJ. While on the federal payroll, Mr. Yoo was busy expanding his credentials and burnishing his resume for the next job on which he had set his sights – a return to academia. The emails offer little or no insight into what real work Mr. Yoo did for OLC, suggesting he preserved virtually no emails dealing with agency business, and virtually none of the emails he sent.

Despite claiming to have fully processed CREW's FOIA requests, DOJ held back from CREW another body of Yoo emails recovered from backup tapes after the agency's discovery that many, if not most, of Mr. Yoo's emails mysteriously had gone missing. According to a February 4, 2011 letter to NARA– DOJ's long overdue response to NARA's February 2010 request for information – this body of recovered emails consists of 15,151 "unique" emails and attachments, including emails from Mr. Yoo's entire tenure at DOJ and emails for another former OLC official, Patrick Philbin, during the period he was working on the OLC torture memos. The Justice Management Division (JMD) retrieved this new collection from email backup tapes and, in Mr. Philbin's case, in part from a DOJ server.

DOJ justified the omission of these recovered emails from its response to CREW's pending FOIA request on the ground CREW was seeking records from OLC. Although in the control of OLC, DOJ claimed they were – at least temporarily – in the possession of JMD when it conducted the recovery effort. As a result, CREW was forced to file another FOIA request with JMD seeking copies of the restored emails as well as documents reflecting the process JMD used for the restoration. In subsequent negotiations with JMD, CREW agreed to limit the scope of this new FOIA request for Yoo emails to the subset of recovered emails DOJ made available for review by the staff of the Senate and House Judiciary Committees.

In partial response to this new FOIA request, JMD provided CREW with a memorandum from Assistant Attorney General for Administration Lee Lofthus to then-Acting Deputy Attorney General Gary Grindler explaining the process JMD used to locate and restore the missing Yoo and Philbin emails. This memo confirms DOJ initially was able to find only 500 emails in Mr. Yoo's account for the 2001-2003 time period, and subsequently retrieved 20,000 emails, including duplicates, from "all available sources."

The memo also explains the record keeping policies and procedures to which Mr. Yoo and all other OLC employees were subject. That guidance directed employees to preserve all of their

---

[1] JMD's analysis of the 500 stored emails available from Mr. Yoo's account revealed that only *one* email was sent by Mr. Yoo; the others all were emails he received.

emails with "record" content[2] either electronically or by printing and storing them in paper files. A June 2000 OLC Manual reminded attorney-advisors of the need to retain "all notes, documents, and e-mails that are important to understanding a decision of the Office." OLC employees retained email records using a computer "autoarchiving" function that was set up to save all email messages in an employee's inbox or sent items folder for 30 days by putting them in .pst files on the employee's H drive. If the H drive became too large, the technology staff would move the archived emails to an archive server on JMD's Storage Area Network (SAN). Employees could access and delete any autoarchived emails on either the H drive or their folder on the archive server. For departing OLC employees, OLC typically requested their emails be copied to a folder on OLC's G drive for OLC's continued use. JMD also had a policy of copying a departed employee's emails to a folder on JMD's SAN, where they were accessible only to specified JMD individuals.

Other sources of emails include the backup tapes JMD created either daily, weekly or monthly. They contain a "snapshot" of all of the data on a particular server at the particular point in time at which the data was backed up. All of the backup tapes had overwrite schedules, although JMD did not always follow that schedule. As a result JMD found 11 backup tapes with email messages from Mr. Yoo that it was able to restore. In addition, JMD reviewed "Gateway logs" it maintains that filter email messages going into and out of DOJ for viruses and the like and capture and log information about the sender, recipient, date, time, and sometimes the subject line of email messages passing through the Gateway. The Gateway neither retains copies of the email contents nor captures internal DOJ emails. Generally JMD saves these logs for only two years, although it found some dating back to July 2002. Finally, JMD determined that during Mr. Yoo's tenure at OLC, no employee had either a classified email account or access to such an account, meaning Mr. Yoo cannot explain away the absence of work-related emails as due to his use of a classified email account.

Using these available sources for preserved emails, JMD initiated a search to locate all existing Yoo emails. From OLC's G drive and a set of DVDs JMD maintained of Mr. Yoo's email account, JMD found approximately 500 emails dated between July 19, 2001, and June 4, 2003. Only one of those emails was from Mr. Yoo's sent items folder; the remainder were from his inbox. In other words, *OLC had stored with its records only a single email Mr. Yoo sent during his DOJ tenure.*

JMD also located 287 backup tapes from the relevant period still in existence notwithstanding JMD policy requiring they be overwritten. Of those 287 tapes, 39 were unreadable and only 11 contained Yoo emails. When coupled with the 500 emails discussed above, JMD found a total of approximately 20,000 emails. This total includes many duplicates.

JMD's review of the Gateway logs revealed that between July 2002 and June 2003, Mr. Yoo sent 3,553 emails from his DOJ email address to outside email addresses, and received 4,810 emails on his DOJ email account from outside email addresses. This is a far cry from the single email

---

[2] The Federal Records Act, 44 U.S.C. §§ 3191 *et seq*, defines a preservation-worthy record as one that evidences the agency's "functions, policies, decisions, procedures, operations, or other activities of the Government"or one whose data has "informational value."

sent by Mr. Yoo that was located on OLC's G drive. These logs, together with the JMD dvds, also revealed Mr. Yoo's use of his university account and one from a private Internet service provider to send email messages. But, as the memo points out, if Mr. Yoo did not send or copy emails from these accounts to his DOJ email address, it is impossible for DOJ to locate such emails.

JMD also attempted to ascertain what happened in 2005, when OPR requested Mr. Yoo's emails. Existing documentation shows OPR was given access to those of Mr. Yoo's emails stored on the JMD SAN and JMD made some effort to restore data from backup tapes that was unsuccessful for unexplained reasons.

The results of JMD's recovery efforts raise serious questions about how and why such a large cache of email was not preserved. JMD advised NARA that given the more than seven years that have elapsed since Mr. Yoo left DOJ, "it is impossible for us to determine whether technical issues caused the loss of the emails or whether they were deleted by an individual." Thus, if an unauthorized destruction of emails occurred, the perpetrator has eluded detection. Just as troubling, there is no way to determine whether other emails from Mr. Yoo's account still are missing. JMD's recovery efforts relied on the 11 backup tapes still existing for the relevant time period, but we have no idea how many more backup tapes from that period were overwritten with new data pursuant to JDM's policy. Nor can we expect any more forensic efforts from the government: NARA has accepted the corrective actions DOJ took and closed out its examination of this matter.


The content of these newly restored emails is equally tantalizing. In response to CREW's FOIA request of JMD for the 36 restored emails shared with congressional staff, JMD produced 15 with minor redactions to protect personal privacy interests and withheld 14 in full as covered by the deliberative process privilege and therefore subject to FOIA Exemption 5. The produced emails are perhaps most interesting for their glimpse into the relationship between Mr. Yoo and Vice President Chief of Staff David S. Addington, as well as the president's role as the "decider in chief" in crafting a position on the use of torture. For example, in a tersely worded email of November 25, 2002 with the subject line "ambiguity," Mr. Addington reminds Mr. Yoo:

> The President of the United States will decide for the United
> States what constitutes a "material breach" as that term is used
> in the relevant UN resolutions. I am sure that the President
> would be interested at the appropriate time in input from the
> Secretary of State, the Secretary of Defense and the Attorney
> General, among others, on that subject, but the decision will,
> I am confident, be his and his alone.

In another email of November 27, 2002, to someone whose name is blacked out, Mr. Yoo expresses relief that no one at DOJ appeared to be aware of his role in aiding then White House Counsel Alberto Gonzales in rewriting the laws of wars. Although a *Wall Street Journal* article mentions his involvement, Mr. Yoo writes: "I did see it [the article], but luckily it did not appear in the DOJ clips, so I caught no flack." Another email offers a glimpse into the relationship

between Mr. Yoo and Mr. Addington, as Mr. Yoo casually inquires "interested in lunch?"  But these emails offer only a limited window on Mr. Yoo's role in drafting the torture memos and we can only speculate on how much more insight could be gleaned from the emails Mr. Yoo did not preserve.

The way DOJ handled CREW's FOIA requests also is revealing.  Despite President Obama's day-one FOIA memorandum emphasizing transparency and disclosure and Attorney General Eric Holder's pro-disclosure FOIA memorandum DOJ resisted disclosure at every turn. CREW had to file suit before DOJ produced even a single record.  And even once in litigation, DOJ's counsel withheld critical information from CREW about DOJ's recovery efforts and the existence of thousands of pages of potentially responsive documents.  DOJ's handling here of a politically sensitive FOIA request mirrors its behavior during the last administration, which many consider a watershed for secrecy in government.

We will probably never know what happened to the Yoo emails that remain missing, or why any emails went missing in the first place.  That gap also means we will never know Mr. Yoo's full role in developing the torture memos and the involvement of high-level White House officials such as Mr. Addington.  While the FOIA may still be the most potent tool the public has to learn what our government is up to, its utility is hampered by the failure of agencies like DOJ to comply with their legal obligations to preserve records that, in the end, belong to the people, not the individuals who create them.

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CITIZENS FOR RESPONSIBILITY AND    )
ETHICS IN WASHINGTON,              )
                                   )
      Plaintiff,                   )
                                   )
      v.                           )        C.A. No. 10-750 (JEB)
                                   )
U.S. DEPARTMENT OF JUSTICE,        )
                                   )
      Defendant.                   )
_____)

**DECLARATION OF LAUREN FARBER**

1. I am the staff assistant at Citizens for Responsibility and Ethics in Washington

(CREW), plaintiff in the above-captioned action. I submit this declaration in support of CREW's

opposition to defendant's motion for reconsideration.

2. I have served as a staff assistant at CREW since April 2011. One of my major

responsibilities is maintaining our Scribd database, an on-line database of legal documents,

reports, and documents. With the aim of promoting transparency and accountability, CREW

posts all FOIA requests it sends and documents it receives in response to those requests, legal

filings, and other documents on CREW's Scribd page, http://www.scribd.com/citizensforethics.

3. Scribd allows me to access information about the read count for a particular file or

document, specifically the total number of times a document has been viewed, including

embedded links and readcasts. I determined from a review of this information on Scribd that to

date, CREW's report, *The Missing John Yoo Emails – What Did CREW Learn?*, has been read a

total of 1,216 times. I further determined the documents and draft *Vaughn* index the U.S.

Department of Justice released in response to CREW's March 2010 FOIA request concerning the

missing John Yoo emails have been read a total of 1,974 times.

I declare under penalty of perjury the foregoing is true and correct.


DATED: November 14, 2011

LAUREN FARBER